Case No. 15-5332 American Wild Horse Preservation Campaign et al. Appellant v. Thomas J. Vilsack Secretary, U.S. Department of Agriculture et al. Mr. Zaft for the Appellant, Mr. Haig for the Appellant Thank you. Good morning. May it please the Court, Your Honor. Your Honors. Excuse me. Before the Court this morning is the Forest Service's decision in 2013 to remove over 23,000 acres from the heart of the Devil's Garden Wild Horse Territory in Modoc County, California. The Forest Service did not make this decision based on any findings that had to do with the conditions of the range. It did not make this decision based on an objective to further the goals of the 1971 Wild Free Roaming Horses and Burros Act or to further the multiple use objectives that the Forest Service implements pursuant to the National Forest Management Act. The reason that the Forest Service made this decision, the reasons that it gave, were one, that the addition of these what we refer to as the middle section lands to the Wild Horse Territory had never been formally ratified in any way. Two, that the Forest Service could never have actually incorporated these lands into the Wild Horse Territory because some portion of them were private, either in the past or currently. And the third justification that the agency gave was that the Forest Service never actually managed the presence of wild horses in these middle section lands. Let me just clarify what your position is on what you call the second reason that was given, which is that the middle section couldn't have been, the Forest Service contends that it couldn't have been incorporated legally under the statute because some of it is in private hands. What is your position on that? Because I couldn't quite get that from your briefs. Okay, Your Honor. Our position is that that is incorrect as far as it pertains to the vast majority of the middle section lands. And I want to clarify, our position is not that the Forest Service is authorized to require private individuals on their own land manage wild horses or keep wild horses, okay? So there's some 10% of this middle section that is currently privately held, and we agree that's not part of the Wild Horse Territory that's private land. But the Forest Service declared in the, the Forest Service, the 91 plan that you're challenging included all of the 250,000 acres. It included, yes, it added about 23,000 acres. Yeah, and so it added all, I mean if you're right, it added all 23,000 acres, including the acres that were privately held. Right, Your Honor. But the documents in the record show that in the Abanzino allotment, where about half of that allotment is privately held, horses were not, there was no management level assigned to that allotment. Now, there were management levels assigned to other allotments in the middle section, the Big Sage allotment and the Bulls allotment. Isn't that your second point, that even if the Forest Service is correct that this was a mistake and this was never part of it, that in any event they were managing? Well, and that's exactly right. Isn't that your second point? That's my second point. So that doesn't answer Judge Wilkins' question. Well, I guess here's what I would say, Your Honor. If the Forest Service had come out in 2013 and said, you know what, we had added these middle section lands, but just to clear up some confusion, these privately held lands are not part of the Wild Horse Territory, we wouldn't be here today. Okay. So if that was the decision of the Forest Service was, you know, this 10% of the middle section that's privately held is actually not part of the Wild Horse Territory, and including that was an error, I think my clients would never have filed the suit. But that's not the way you're litigating this case. You're litigating this case as if the entirety of that middle section was and is appropriately part of the plan and of the area. We're focused on the fact that, as Judge Tatel mentioned, that the Forest Service added these middle section lands and managed wild horses there for decades. And then in 2013 turned around and said, you know, this was all some sort of administrative error. Now we're going to remove all 23,000 acres that were added in the mid-1980s and that were formally added in 1991 when they adopted the forest plan. We're saying, you know, for an agency to consistently manage these middle section lands for the presence of wild horses for decades and then to turn around and say that this was all an error, that is not reasoned decision-making, especially when they don't, you know, all the three reasons that I laid out at the beginning. Is it reasoned decision-making for them to manage the entirety of that section when the statute says that they can't? Your Honor, I don't know that the statute says that they can't manage the areas that they added in the mid-1980s, setting aside the small fractions that are privately held. I don't want to set that aside, but that's a critical part of your contention. Well, then the decision that the Forest Service made to address that, if they were only focused on those private lands, is grossly over-broad, I guess is what we would say, given that it's taking 90 percent of the middle section, which is not privately held, and withdrawing that from the wild horse territory. And secondly, I'd say there are these publicly held parts of the middle section where the Forest Service for decades was managing the presence of wild horses. They even had minimum, I'm sorry, management minimum levels for horses in the Big Sage and the Bulls' allotments from at least 1994, perhaps earlier, all the way through 2012. This is like... So maybe the problem is the problem here that to the extent there's some confusion, at least about the 90 versus 10 percent, that at a minimum here the agency had to grapple with the history and explain what it was doing, and it didn't do that here. That's, I guess, what I had understood your position... That's right. ...to be, that they didn't... I mean, if there's confusion about this, that should have been part of what they addressed instead of just going, oops, and erasing the whole thing. That's right, Your Honor. And I think I would just make two points to tag along to that. They didn't really wrestle with anything. They never addressed the fact in their decision-making documents. They never addressed the fact of what they had been doing. They never acknowledged it. They actually said all along, and they even say today, we never had any horses there that we managed. So really this doesn't have any environmental impact. We can just withdraw all these lands from the wild horse territory underneath and we don't have to analyze anything because we're not changing the status quo. That is not true. The record, what their position is at direct odds with the record, which shows that they did add these lands to the wild horse territory, that this was formally incorporated in the 1991 forest plan where they clearly and unequivocally state that they were legally obligated to manage a single wild horse territory of 258,000 acres. And then we have all of these wild horse inventory forms that show that that is, in fact, what they did. I thought they also actually moved horses from outside the territory into the bowls and Big Sage. That's right, Your Honor. They actually put horses there. Yeah, some of those wild horse territory inventory forms show that they would identify horses outside of the larger contiguous wild horse territory. And when they did, in some instances, they moved them back into the wild horse territory, including into the middle section. So they always treated the middle section as if it was part of the larger wild horse territory. Could you answer a practical question for me that I don't understand? Yes. Why does it matter? What are the practical consequences of not including this 90% portion in the wild horse territory? As I read the statute, the statute essentially makes all the wild horses wards of the secretaries. They're supposed to protect those. The wild horse territory thing is the creation of regulations. But the horses, I thought as I read the statute, would still be protected whether they're in a regulatory territory or not as long as they're on public lands. So what is the consequence of this not being a regulatory territory? They just don't set management levels? Well, there would be two things. There's two ways I'd like to respond to that. First of all, just on the ground practically, what would happen is you're taking away this large swath of territory from the very center of the wild horse territory. Well, are there fences so then the horses can't go? Or I thought the horses could still pass through. It's just they didn't have this legal status. Yeah, the horses would not be able to travel from the east to the west range because those are no longer contiguous. The middle section created this flow. They may not be contiguous on a map. Are there actual fence? I mean, when they declare something a wild horse territory, do they throw up fences so they can't go? Well, we saw that when horses stray outside of the wild horse territory, they're captured and removed. And so they would be. And the agency has said they will zero out the horses in the middle section. The other thing I wanted to say, though, Your Honor, if I can take a step back and look at the bigger picture, is this the way that we want agencies to conduct themselves? And this brings up, I think, the Encino Motor Cars case, which we cite that the Supreme Court handed down last year. You have a situation here where an agency has consistently managed horses in a particular way and managed the entire wild horse territory in a particular way for decades. And they even formally state this in the governing 1991 force plan, this is how we're going to do it. And then suddenly, after many decades of doing this, the agency says, whoops, this was all an administrative error. And from an administrative policy standpoint, is this the way we want agencies to conduct themselves? They didn't provide an analysis or they didn't struggle with what were the implications of this. They never even acknowledged the status quo of what they were doing. Aren't there two different issues here? I just want to be sure I understand. Let's just assume, for example, for purposes of discussion, that we think that the agency's argument that it could never legally have included this in the territory justifies its decision, its 2013 decision,  Assume we think that. You still have a case, right? Your case is that, well, it doesn't make any difference because, according to the evidence that you submitted, they in fact managed wild horses on that land actively, correct? Yes. And that they failed to take that into account in their environmental assessment. Exactly, Your Honor. Is that right? So there's two issues, right? Yes, Your Honor. And the second issue doesn't really have anything to do with the first one, does it? I agree, Your Honor. There's a case, I think it's the City of Kansas City case, where they say, even if the agency's interpretation of the statute survives, in that case, the Chevron review, there's an independent issue that still must be resolved, which is whether or not the environmental review was done properly under NEPA and APA. And that is our position. Okay. Do you agree that, at least as to the 90 percent, there was any legal barrier to them managing horses on that land in the 80s? We think there was absolutely no legal barrier. There's nothing in the Wild Horse Act, and we don't believe there's anything even in the regulations that would preclude the Forest Service from adding these public lands to the wild horse territory. I might add to that, Your Honor, in the Forest Service manual, it actually provides that the Forest Service, it authorizes the Forest Service to modify the boundaries of the wild horse territory. So this idea that once the boundaries were set in 1975, they were sacrosanct and could never be changed, I think is wrong. And actually, we cited a couple of examples where the service's sister agency, the Bureau of Land Management, which manages a lot of wild horse areas throughout the country, they have modified the boundaries and even expanded the boundaries of wild horse territory. When they created the initial two separate territories, in creating that, did they determine that those territories fully encompassed the territory in which horses had originally been found, had occurred in 1971 at the time of the statute's enactment? Or I guess I had assumed that the territories were somewhat smaller than the factual, empirical evidence as to where horses would have been in 1971. There is no finding in the record or in the, for instance, the 1975 Wild Horse Management Plan where they say, we've done this inventory and these are the exact areas where horses exist. In fact, there are some stray comments in the record that indicate that horses existed outside of those boundaries, but they said, you know, so there aren't a lot of findings in the record about what was done. And, you know, I might also note that that territory was established in 1975. So the Forest Service has taken the position that you have to limit yourself to where horses were found in 1971. Well, they didn't go out and do that right away. In 1975 they established the Wild Horse Territory. We think the Wild Horse Act authorizes the service not only to establish the Wild Horse Territory, but to modify its boundaries and in some cases expand it as it's done here. Okay. Anything else? Okay. Thank you. Thank you, Your Honor. Thank you. May it please the Court, I'm Mark Hague from the Department of Justice. With me at council table is Stephen Hirsch of the Department of Agriculture's Office of General Counsel. And also at council table is Caroline Lobdell of the Western Resources Legal Center who represents the interveners. I guess I would like to jump in responding to your question, Judge Millett, about why does it matter, which I think also responds to Judge Tatel's question for analysis of two separate issues, the legal question, could the agency do it, and the factual question of what the management was. The reason it matters is because there's a legal question of what Congress intended the agencies to manage as Wild Horse Territory. The Wild Horses Act instructs the agencies to protect horses where they were found on public lands in 1971. So I disagree with Mr. Zaft's statement that the agency could designate Wild Horse Territory on lands that was acquired after 1971. Well, wait, it doesn't say on public lands where horses are found in 1971. The statute says where they're found. No, that's right. If they happen to be on private land and then you got it, it could still be that private land, in fact, was a place where they were found in 1971, nothing would impair your ability to then take it. That section 1331 of the Act says protect them where they're found. 1332 of the Act, the definitions, defines wild horses, and it defines wild horses as horses that are on public land. When you read the 1331, the definition in 1332, and then the regulations at 16 CFR 222.13, 14, and 15, they make it clear that the agency's view is it has to protect horses and it creates territories where the horses were found on public lands in 1971. So does that mean, because you've got these territories all over the West, like 36 of them, does that mean that all of those capture 100% of the territory in which wild horses were found in 1971, or have you created territories for your management purposes that are smaller, recognizing the horses themselves may still be protected if they wander off? Are all your territories, have you captured 100%? I'm sure we haven't captured 100%, Your Honor, but I think that the agency's obligation was to try. I think there's also a distinction between horses present, the mere fact that a horse has been there at some point, and whether the area actually constitutes territorial habitat, which is, I think, a statutory term and is also in the regulations as being the key factor. So is there a determinate, at least the entire West of the United States, as to the two original territories here, was there ever a determination that those territories were it for purposes of the statutory test of where horses occurred in 1971? I think that's what the 1975 Territory Management Plan is. Does it make that finding that that's where they were, or that's, because you can just imagine all kinds of reasons why your territory would draw lines that would be somewhat different from what you could have drawn for purposes of your management and protection and where you're putting your resources. I think that's what the 1975 Management Plan does, and there's a map attached to the 1975 Territory Plan. So I'm just curious, because you also have regulations that say you can adjust these boundaries, and so I'd assume the reason you have that is because you're not purporting to capture everything, or you recognize you might learn something later, or you might get better information later. These things aren't written in stone. I think the reasons for adjusting boundaries would be a determination that, in fact, there were horses. We now have information that there were horses on this meadow all through the 50s and 60s, and therefore it should be included in the territory. But I don't think that the statute authorizes the agencies to establish territories on land that was not federal land in 1971, that was not territorial habitat of wild horses. So it's in 90% of the middle section? The private land only deals with 10%, so 90% of the middle section. As of 1975, when the territory was designated, and as of 1971, it was 25% of that middle section, but not 10%. Okay, so 75%, okay. Right, 25% of it was privately owned, 75% of it was publicly owned. There is evidence in the record from the early 70s that horses were occasionally seen in that area. But the determination that the agency made in 1975 was that the territorial habitat consisted of these two units. It was identified as one territory, two separate non-contiguous units, totaling 236,000 acres. So then sometime in the 80s, someone draws a map that connects the two non-contiguous units, and that's when the confusion begins. 1991, the Forest Plan includes these two sentences that say, we have a wild horse territory of 258,000 acres. But that's it. There's no explanation, there's no indication in the record of the 91 Forest Plan of an intent to make a big change in management. And in fact, the 1991 Forest Plan incorporates the wild horse management plan that was in effect at the time, and says we're incorporating this without change. The plan that was in effect at that time was the 1982 management plan, which, like the 1981 management plan, the 1980 management plan, and the totaling 236,000 acres. You've got the problem here, that this was more than just a, oops, on a map, that you spent two decades at least managing horses, setting management levels for horses, moving horses into this area. And so it's not just a map and a mistaken piece of paper. But we need to talk about that, because the extent to which this area was managed for wild horses, Mr. Zapp greatly exaggerates what the record shows in terms of management of that disputed area. Well, when you talk about that, could you do it please in terms of these monitoring reports that are in the record? Yes. Because they actually seem to suggest that they were actively managed. Well, there are monitoring reports. Take the 94 report. It says that Big Sage has an AML of 20, and Bowles, which is part of Triangle, has 40. And then it's got this language on the next page which suggests that there's some active management going on. It says that we've seen horse sign in these areas. That area is outside. But these horses should be moved back over to the Bowles allotment, which is part of the disputed area, right? Right. So this report looks like, A, you've got the Forest Service has goals for the number of horses on this property, and number two, that it's managing them. Right? Right. It's putting horses there. Yeah, we're adding horses too. Outside the territory. Right. So why isn't that a pretty – and the EA didn't consider this at all, did it? Well, let me take – let me respond to the monitoring question first. The monitoring reports from 1987 to 1980 – from 1987 to 1993, which are all in the record. So 87, 88, 90, 92, 93 all have this same table. I think that you're referring to Judge Tatel on JA589. And in the earlier versions of the table – actually, I'm giving you the wrong page there. Yeah, so the 1994 is 857. The one I was talking about was 857. 857. Yeah. So if you look at page 861 or 859, the monitoring reports from 1987 to 1983 include that same table, but the first column does not include this heading Designated Management Herd Minimum Size. And I agree that the references to 20 horses on Big Sage and 40 horses on Bulls are – they're incorrect or they're inconsistent with the Forest Service's view that the forest – the 1991 forest plan was not intended to change that. I guess the petitioner's view about that is that that's exactly why the agency needed to wrestle with this in its environmental assessment. And it didn't. And if I could just – before you go on, you're stopping with 1993, and it's 94, 96, 97, 98, 2001, 2004, 2010. Yeah. So all the other – the reports then pick up and carry that language on through. No, no, yeah. They set management levels and they move horses there. Well, these are monitoring reports. They're not decision documents. They don't reflect a formal determination by the agency that we need to change this. They are evidence of what the agency was doing that's consistent with the map and consistent with what the 1991 forest management plan incorporated. And it's not just a report. These are recommending – it may not be decisional in the sense of something in the Federal Register, but they are saying horses should be moved from somewhere else to these places. The number of horses that are being proposed to be moved in both the 1994 and the 1996 monitoring reports is three to five horses. But you see, the issue here isn't – we're not assessing this here. The argument is that the agency didn't look at this. I mean, it could well have said, if it had looked at these documents, what it was doing, its environmental assessment. Hey, it's only three horses, right? Then we would have known that the agency accounted for these reports. But the EA is silent about this. That's the point. The EA discusses the environmental effects of managing – but does it mention any of these inventories? I didn't think it did. Do you think it did? Did the EA look at these? I don't think the EA discusses these monitoring reports. Doesn't the EA say something like there's really no significant – between the EA and the FONSI there's no significant impact because these areas were never really managed or something to that effect. But, you know, I guess to the points that have been made, isn't that factually unsupported? I think the fact that supports it – and I wanted to get to in addressing this. These monitoring reports assign minimum numbers that are apparently based on the total acreage. But at the same time, the appropriate management level for the entire wild horse territory remains unchanged. From 1975 to 1981 until this new plan, it's 305 horses for the whole wild horse territory. And the amount of forage – Just to make sure I understand what you're saying, I thought it actually had shifted to a range rather than a specific amount. The target amount starts out at 305. In the 80s and then in the forest plan – When all this was happening. The target stays the same. It's 305. But now the limit is expressed as a range, plus or minus 10%. And then the latest plan, the amended plan, makes that range broader from about 200 to about 400. But the target is still 305. And the amount of forage that's allocated to wild horses remains constant through the whole period. It's 4,400 animal unit months of forage for horses. So when the EA says that the management hasn't changed, notwithstanding these monitoring reports, the amount of forage and the total animal appropriate management level has not changed during this period. I'm having trouble understanding what that shows because it may well be that they actually needed this middle section to hit that target because of something that may have been going on in some of the other territories. If there were circumstances of environmental concerns or grazing by other animals that made some portion of the other two original territories unable to help get to that target amount. I guess I don't understand how simply saying the target was the same and having documentation that shows we're actively managing that as part of reaching that target shows that you weren't managing it. There has never been any difficulty in reaching the target. The difficulty has been that the target has been vastly exceeded year after year after year. There are about three times as many horses on the area now as the goal, as the appropriate management level. So the problem has not been to have enough horses. It's been to remove enough horses. Well, then doesn't that make the fact that you're removing horses in here even more significant? I guess most of the horses that are being removed, about 75% of the horses that are on the forest now are in the territory management area, the two discrete units of the territory management area. 25% are outside of the wild horse territory, and most of those are in this disputed area. Can I ask you a technical question? Sure. Has the service already implemented the non-significant amendment, which you all call the non-significant amendment to the 1991 Forest Plan, or has that not yet been implemented? It has been implemented. It was? Yes. Thank you. Thank you. Counsel, you used up all his time, right? Okay. You can have one minute. Just a couple of points. First of all, one thing I'd note, with the wild horse inventory forms, it's not just important that they brought horses into the middle section lands. They also did not do mass removals of the horses that were in the holes in Big Sage allotments. So they were managing those horses the same way they were managing horses throughout the rest of the wild horse territory. The second point I'd just add is none of what the government has said is applicable to the Big Sage allotment. That was always publicly held. And then the third point is just this note, I think, Judge Millett, that you mentioned. They changed the way they managed the horses in two ways. One, they added the middle section, but then they expanded the range. They made those changes in the mid-1980s. They incorporated both of those changes into the forest plan. When they changed, again, the range, they did a full-blown environmental review and analyzed alternatives. They did not do that kind of analysis when they decided to remove the middle section. And that's what is left here. I just have a quick, almost non-record question. I'm just curious. Service says somewhere in here that there's not much public access here, right? Is that true? I don't mean is that true. But I take it this land is pretty inaccessible. Well, so I'm from Los Angeles, Your Honor. Modoc County is not a place where a lot of people visit. And I say that with all due respect to the people that live there. I personally have not been, but my clients have in Dugo. I mean, I assume that's one of the reasons why there are wild horses there, right, is that there's not a lot of people wandering through this area. I think that's right, Your Honor, because a lot of wild horse populations were decimated before the Wild Horse Act was passed. Well, thank you. It also suggests, I think, that when horses are driven from one place to the other, it's being done by helicopter, which I guess suggests that it's not an easy walk or ride there. That's an interesting point. Okay, well, thank you. Case is submitted.
judges: Tatel, Millett, Wilkins